JPL/FJN:BW/ADW
F. #2022R00325

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

JULIO CESAR MONTERO PINZON,
    also known as "El Tarjetas," "Moreno,"
    "El Chess," "Cesar Hernandez Jimenez"
    and "CH Jimenez,"
GRISELDA MARGARITA ARREDONDO
PINZON and
CARLOS ANDRES RIVERA VARELA,
    also known as "La Firma," "El
    Colombiano," "More" and "Morro,"

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT
E.D.N.Y.
*OCTOBER 27, 2025*
BROOKLYN OFFICE

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 25-169 (S-1) (MKB)
(T. 18, U.S.C., §§ 981(a)(1)(C),
981(a)(1)(G), 982(a)(1), 982(b)(1), 1349,
1956(h), 2339B(a)(1), 3238, 2 and 3551 et
seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C.,
§ 2461(c))

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Superseding Indictment, unless otherwise indicated:

I.    <u>The Defendants and Relevant Entities, Individuals and Terms</u>

    A.    <u>The Defendants and the Jalisco New Generation Cartel</u>

        1.    The defendant JULIO CESAR MONTERO PINZON ("MONTERO PINZON"), also known as "El Tarjetas," "Moreno," "El Chess," "Cesar Hernandez Jimenez" and "CH Jimenez," was a citizen and resident of Mexico. MONTERO PINZON was a senior member of the Jalisco New Generation Cartel, also known as the Cartel de Jalisco Nueva Generacion or CJNG ("CJNG").

2. The defendant GRISELDA MARGARITA ARREDONDO PINZON ("ARREDONDO PINZON") was a citizen and resident of Mexico, and a half-sibling of the defendant JULIO CESAR MONTERO PINZON. ARREDONDO PINZON was associated with CJNG and oversaw the receipt, transfer and laundering of funds on behalf and for the benefit of the cartel.

3. The defendant CARLOS ANDRES RIVERA VARELA ("RIVERA VARELA"), also known as "La Firma," "El Colombiano," "More" and "Morro," was born in Colombia and was a naturalized citizen and resident of Mexico. RIVERA VARELA was a senior member of CJNG.

4. CJNG was a Mexico-based transnational criminal group that controlled a significant portion of the narcotics trafficking trade. Formed in or about 2011 from the remnants of the Milenio Cartel, which was affiliated with the Sinaloa Cartel, CJNG had a presence in dozens of countries, including the United States. The cartel maintained its vast drug trade through violence, bribery of corrupt officials and a franchise-based command structure.

5. CJNG's leadership included a small group of top-tier commanders and a second tier of bosses that operated under the top-tier leaders. The franchise model permitted each franchise group to customize its operations according to specific areas of expertise (for example, running clandestine methamphetamine labs) or market demands, provided it complied with naming, branding and organizational structure requirements and followed the general direction of CJNG leaders. Because new franchises were easy to establish, the franchise model enabled CJNG to expand quickly. CJNG also maximized its revenue through this model, because leadership did not pay the operating costs of its franchises but did collect a percentage of overall profits.

6. CJNG obtained methamphetamine and fentanyl precursor chemical shipments from China and cocaine shipments from South America. CJNG illicitly transported cocaine, methamphetamine, fentanyl and other controlled substances into the United States. CJNG also engaged in money laundering, bribery, extortion of migrants, taxing of migrant smugglers and other criminal activities, including acts of violence and intimidation.

7. On or about February 20, 2025, the United States Secretary of State designated CJNG as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act, and as a Specially Designated Global Terrorist ("SDGT") under Executive Order 13224. CJNG remains a designated FTO and SDGT.

B. Additional Relevant Individuals, Entities and Terms

8. "Contadores" ("accountants" in Spanish) were individuals who oversaw the receipt, transfer and laundering of funds on behalf and for the benefit of CJNG.

9. "Pagadores" ("payers" or "paymasters" in Spanish) were individuals who owned and operated bank accounts held in the names of shell entities and/or straw owners used on behalf of and for the benefit of CJNG.

10. Bank 1, Bank 2 and Bank 3, entities the identities of which are known to the Grand Jury, were financial institutions based in Mexico.

11. Company 1, Company 2, Company 3 and Company 4, entities the identities of which are known to the Grand Jury, were shell companies used to receive, transfer and launder funds on behalf and for the benefit of CJNG. Company 1 and Company 4 maintained bank accounts at Bank 1. Company 2 maintained a bank account at Bank 2. Company 3 maintained a bank account at Bank 3.

12. The "Resort Company," an entity the identity of which is known to the Grand Jury, was a Mexican conglomerate principally involved in the development and operation of, among other things, hotels, resorts, cruises and golf courses. The Resort Company was headquartered in Nuevo Nayarit, which was formerly known as Nuevo Vallarta. Nuevo Nayarit, which was located in the Mexican state of Nayarit, was located approximately nine miles from Puerto Vallarta, which was located in the Mexican state of Jalisco. The Resort Company operated numerous hotel chains in Mexico.

13. The "Hotel Chain," an entity the identity of which is known to the Grand Jury, was a Mexican chain of hotels operated by the Resort Company. The Hotel Chain had hotels located in Nuevo Nayarit (located in the Mexican state of Nayarit), Puerto Vallarta (located in the Mexican state of Jalisco), Riviera Maya (located in the Mexican state of Quintana Roo), Acapulco (located in the Mexican state of Guerrero), Puerto Peñasco (located in the Mexican state of Sonora) and Mazatlán (located in the Mexican state of Sinaloa).

14. A timeshare was a collective model of vacation real estate in which multiple buyers own or lease allotments of usage for the same property. For example, timeshare owners typically purchased a fractional ownership interest in a property, entitling them to use the property for a fixed amount of time per year. Timeshare properties were usually located in popular vacation destinations, including many cities in Jalisco.

II. Overview of the Fraudulent Scheme

15. In or about 2011, CJNG became aware of a lucrative timeshare fraud scheme (the "Timeshare Fraud Scheme") being operated in CJNG-controlled territories, including Jalisco. The Timeshare Fraud Scheme was an "advance fee" scheme in which victim timeshare owners, many of whom were residents and citizens of the United States, were

4

fraudulently induced to pay money up front either to sell or rent their timeshares under the pretext of fees and taxes, in exchange for false promises of receiving money later. Despite paying the advance fees, the victim timeshare owners did not receive the funds as promised and were unable to recoup their advance fee payments.

16. The Timeshare Fraud Scheme was initially perpetrated by individuals unaffiliated with CJNG. However, in or by approximately 2012, CJNG, including the defendant JULIO CESAR MONTERO PINZON, asserted control over the Timeshare Fraud Scheme that was being operated in CJNG-controlled territory and demanded to be paid portions of the Timeshare Fraud Scheme operators' monthly profits. Among other things, the profits were further distributed to or at the direction of the defendant CARLOS ANDRES RIVERA VARELA.

17. Victims of the Timeshare Fraud Scheme were defrauded of funds in one or more of the three interrelated sub-schemes, each of which itself was an advance fee scheme.

(a) <u>Timeshare Sale or Rental Sub-Scheme</u>: The Timeshare Sale or Rental Sub-Scheme functioned as the first stage of the Timeshare Fraud Scheme. In the Timeshare Sale or Rental Sub-Scheme, victim timeshare owners were contacted by purported timeshare brokers who falsely claimed to be able to sell or rent the timeshare owners' timeshares. After the timeshare owners agreed to sell or rent their timeshares, the purported brokers informed the timeshare owners that they had to pay various advance fees, such as transaction fees and taxes, before they could receive the proceeds of the sale or rental. Victims of the Timeshare Sale or Rental Sub-Scheme paid these advance fees but never received the promised sale or rental proceeds. Victims of the Timeshare Sale or Rental Sub-Scheme included individuals who owned timeshares at, among other places, properties operated by the Resort Company.

5

(b) <u>Law Firm Sub-Scheme</u>: In the Law Firm Sub-Scheme, timeshare owners who had been victimized in the Timeshare Sale or Rental Sub-Scheme were contacted by individuals claiming to be lawyers (or associated with lawyers) who falsely claimed they could help the victims recover the funds they lost in the Timeshare Sale or Rental Sub-Scheme if they paid various advance fees. In some instances, the purported lawyers claimed that a monetary settlement with the perpetrators of the Timeshare Sale or Rental Sub-Scheme had already been reached, and the purported lawyers requested upfront payments for the release of the victims' alleged settlement amounts. Despite paying these advance fees, the victims did not receive any funds in connection with purported legal action taken against the perpetrators of the Timeshare Sale or Rental Sub-Scheme.

(c) <u>Government Sub-Scheme</u>: In the Government Sub-Scheme, timeshare owners who had been victimized by either the Timeshare Sale or Rental Sub-Scheme and/or the Law Firm Sub-Scheme were contacted by individuals claiming to work for either United States or Mexican government agencies who falsely claimed they could help victims of these scams recover their lost funds if the victims paid certain advance fees. Despite paying these advance fees, the victims did not receive any funds in connection with purported government efforts to recover funds on behalf of the victims of the Timeshare Sale or Rental Sub-Scheme and/or the Law Firm Sub-Scheme.

III. <u>The Defendants' Participation in the Timeshare Fraud Scheme and Use of Illicit Proceeds to Provide Material Support to CJNG</u>

18. As part of the three interrelated sub-schemes described above that comprised the Timeshare Fraud Scheme—the Timeshare Sale or Rental Sub-Scheme, the Law Firm Sub-Scheme and the Government Sub-Scheme—victims were fraudulently induced to pay various advance fees through materially false and fraudulent pretenses, representations and

promises that they would financially benefit from doing so. The defendants JULIO CESAR MONTERO PINZON and GRISELDA MARGARITA ARREDONDO PINZON, together with others, promoted the Timeshare Fraud Scheme and concealed the proceeds derived from it by, among other things: (a) operating call centers to solicit and contact victim timeshare owners through unsolicited telephone calls and using scripts to communicate various false and fraudulent pretenses, representations and promises to induce victims to pay advance fees; (b) sharing lead lists that contained contact and ownership information for individuals who owned timeshares in Mexico, including at Hotel Chain locations, which were used to identify and target potential victims of the Timeshare Fraud Scheme; (c) creating and using fake identities and sham and fictitious contracts, websites, web domains and email accounts to create the appearance of legitimacy for their operations; and (d) using pagadores and contadores to manage the establishment and utilization of foreign and domestic bank accounts held in the names of shell entities and straw owners.

19. Since approximately 2012, in furtherance of the Timeshare Fraud Scheme, the defendant JULIO CESAR MONTERO PINZON participated in the creation and management of a financial network for receiving and laundering Timeshare Fraud Scheme victim funds including arranging for the acquisition and use of pagadores' bank accounts to receive and launder victim funds. MONTERO PINZON also used violence and the threat of violence in furtherance of the Timeshare Fraud Scheme.

(a) For example, in or about and between October 20, 2015 and December 14, 2015, a victim timeshare owner ("Victim 1"), an individual whose identity is known to the Grand Jury, transferred approximately $76,000 from a bank in the United States to a Bank 1 bank account held in the name of Company 1 and approximately $295,053.50 from a

bank in the United States to a Bank 2 bank account held in the name of Company 2. Both Company 1's and Company 2's bank accounts, in turn, transferred funds to one or more Mexican bank accounts held in the name of Company 3. In or about 2015, bank accounts held in the name of Company 1 and Company 2 transferred approximately $1,098,519 Mexican pesos (approximately $75,797) and approximately $7,071,750 Mexican pesos (approximately $487,950), respectively, in at least 50 transactions to bank accounts held in the name of Company 3. Prior to the transfers, MONTERO PINZON had obtained control of Company 3 from a pagador for use in the Timeshare Fraud Scheme through violence and the threat of violence.

 (b) On or about March 3, 2023, Victim 1 transferred approximately $7,569.90 from a bank in the United States to a Mexican bank account held in the name of Company 4.

 20. In furtherance of the Timeshare Fraud Scheme, under the direction and control of the defendant JULIO CESAR MONTERO PINZON, the defendant GRISELDA MARGARITA ARREDONDO PINZON, who functioned as a contadora herself, worked at a CJNG-controlled central office that oversaw operations of the call centers managed by other contadores.

 21. The defendants JULIO CESAR MONTERO PINZON and GRISELDA MARGARITA ARREDONDO PINZON, together with others, took and agreed to take additional steps to promote the Timeshare Fraud Scheme and conceal the proceeds derived from it. For example, first, pagadores would receive funds from victims into various United States-based bank accounts that had been provided to ARREDONDO PINZON and others for the express purpose of receiving victim funds. Second, to minimize the risk of arousing suspicion at

the United States-based banks, regulators and/or with law enforcement, pagadores would then aggregate the victim funds received in multiple accounts into a single United States-based bank account in anticipation of transferring the funds to Mexico. Third, the aggregated funds would then be transferred from the United States-based bank account to various Mexico-based bank accounts at the direction of ARREDONDO PINZON and other contadores.

22. In or about and between January 2025 and May 2025, one or more pagadores transferred over $39,000 in what the defendants JULIO CESAR MONTERO PINZON, GRISELDA MARGARITA ARREDONDO PINZON and CARLOS ANDRES RIVERA VARELA believed were Timeshare Fraud Scheme victim funds to Mexican bank accounts that had been identified by contadores. At least $31,000 of these funds were transferred after on or about February 20, 2025, when CJNG was designated as an FTO.

23. Following CJNG's designation as an FTO and knowing that CJNG had been designated as an FTO, the defendants JULIO CESAR MONTERO PINZON and CARLOS ANDRES RIVERA VARELA took and agreed to take yet additional steps to promote the Timeshare Fraud Scheme and conceal the proceeds derived from it including to transfer proceeds of the scheme via cryptocurrency, instead of traditional bank-to-bank transfers of fiat currency. At the direction of MONTERO PINZON and RIVERA VARELA, in or about and between April 2025 and May 2025, MONTERO PINZON and RIVERA VARELA received from a pagador approximately $22,000 worth of the cryptocurrency Tether, which MONTERO PINZON and RIVERA VARELA believed represented Timeshare Fraud Scheme victim funds, directly to cryptocurrency wallets provided by MONTERO PINZON to the pagador. These transfers occurred after CJNG had been designated as an FTO.

## COUNT ONE
(Conspiracy to Commit Wire Fraud)

24. The allegations contained in paragraphs one through 23 are realleged and incorporated as if fully set forth in this paragraph.

25. In or about and between August 2012 and May 2025, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere out of the jurisdiction of any particular State or district, the defendants JULIO CESAR MONTERO PINZON, also known as "El Tarjetas," "Moreno," "El Chess," "Cesar Hernandez Jimenez" and "CH Jimenez," and GRISELDA MARGARITA ARREDONDO PINZON, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud one or more owners of timeshares for vacation properties located in Mexico, and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349, 3238 and 3551 et seq.)

## COUNT TWO
(Conspiracy to Provide Material Support to a Foreign Terrorist Organization)

26. The allegations contained in paragraphs one through 23 are realleged and incorporated as if fully set forth in this paragraph.

27. On or about and between February 20, 2025 and May 2025, both dates being approximate and inclusive, within the Eastern District of New York, the extraterritorial jurisdiction of the United States and elsewhere out of the jurisdiction of any particular State or

district, the defendants JULIO CESAR MONTERO PINZON, also known as "El Tarjetas," "Moreno," "El Chess," "Cesar Hernandez Jimenez" and "CH Jimenez," and CARLOS ANDRES RIVERA VARELA, also known as "La Firma," "El Colombiano," "More" and "Morro," together with others, did knowingly and intentionally conspire to provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b), including services, personnel including themselves and others, and property including currency and monetary instruments, to a foreign terrorist organization, to wit: CJNG, which at all relevant times was designated by the Secretary of State as a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act, knowing that CJNG was a designated foreign terrorist organization and that CJNG had engaged in and was engaging in terrorist activity and terrorism, and the offense occurred in part within the United States, the offense occurred in and affected interstate and foreign commerce and, after the conduct required for this offense occurred, the defendants were brought into and found in the United States.

(Title 18, United States Code, Sections 2339B(a)(1), 3238 and 3551 et seq.)

### COUNT THREE
(Providing and Attempting to Provide Material Support to a Foreign Terrorist Organization)

28. The allegations contained in paragraphs one through 23 are realleged and incorporated as if fully set forth in this paragraph.

29. In or about and between February 2025 and May 2025, both dates being approximate and inclusive, within the Eastern District of New York, the extraterritorial jurisdiction of the United States and elsewhere out of the jurisdiction of any particular State or district, the defendants JULIO CESAR MONTERO PINZON, also known as "El Tarjetas," "Moreno," "El Chess," "Cesar Hernandez Jimenez" and "CH Jimenez," and CARLOS ANDRES RIVERA VARELA, also known as "La Firma," "El Colombiano," "More" and "Morro," did

11

knowingly and intentionally provide and attempt to provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b), to wit: services, personnel including themselves and others, and property including currency and monetary instruments, to a foreign terrorist organization, to wit: CJNG, which at all relevant times was designated by the Secretary of State as a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act, knowing that CJNG was a designated foreign terrorist organization and that CJNG had engaged in and was engaging in terrorist activity and terrorism, and the offense occurred in part within the United States, the offense occurred in and affected interstate and foreign commerce and, after the conduct required for this offense occurred, the defendants were brought into and found in the United States.

(Title 18, United States Code, Sections 2339B(a)(1), 3238, 2 and 3551 et seq.)

## COUNT FOUR
(Conspiracy to Commit Money Laundering)

30. The allegations contained in paragraphs one through 23 are realleged and incorporated as if fully set forth in this paragraph.

31. In or about and between August 2012 and May 2025, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere out of the jurisdiction of any particular State or district, the defendants JULIO CESAR MONTERO PINZON, also known as "El Tarjetas," "Moreno," "El Chess," "Cesar Hernandez Jimenez" and "CH Jimenez," GRISELDA MARGARITA ARREDONDO PINZON and CARLOS ANDRES RIVERA VARELA, also known as "La Firma," "El Colombiano," "More" and "Morro," together with others, did knowingly and intentionally conspire:

(a) to transport, transmit and transfer, and attempt to transport, transmit and transfer monetary instruments and funds from one or more places in the United

12

States to and through one or more places outside the United States, and to one or more places in the United States from and through one or more places outside the United States: (i) with the intent to promote the carrying on of one or more specified unlawful activities, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, and providing material support to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B (the "Specified Unlawful Activities"), contrary to Title 18, United States Code, Section 1956(a)(2)(A); and (ii) knowing that the monetary instruments and funds involved in the transportation, transmissions and transfers represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmissions and transfers were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the Specified Unlawful Activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i); and

(b) to conduct one or more financial transactions in and affecting interstate and foreign commerce, which transactions involved property represented by a law enforcement officer and a person at the direction of, and with the approval of, a federal official authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of the Specified Unlawful Activities, and property used to conduct and facilitate the Specified Unlawful Activities, with the intent (i) to promote the carrying on of the Specified Unlawful Activities, contrary to Title 18, United States Code, Section 1956(a)(3)(A), and (ii) to conceal and disguise the nature, the location, the source, the ownership and the control of property believed to be the proceeds of the Specified Unlawful Activities, contrary to Title 18, United States Code, Section 1956(a)(3)(B).

(Title 18, United States Code, Sections 1956(h), 3238 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT ONE

32. The United States hereby gives notice to the defendants charged in Count One that, upon their conviction of the offense charged in Count One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense.

33. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

# CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS TWO AND THREE

34. The United States hereby gives notice to the defendants charged in Counts Two and Three that, upon their conviction of either of such offenses, the government will seek forfeiture in accordance with: (a) Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses; and (b) Title 18, United States Code, Section 981(a)(1)(G) and Title 28, United States Code, Section 2461(c), which require the forfeiture of all assets, foreign or domestic: (i) of any individual, entity, or organization engaged in planning or perpetrating any Federal crime of terrorism (as defined in Title 18, United States Code, Section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization; (ii) acquired or maintained by any person with the intent and for the purpose of supporting, planning, conducting, or concealing any Federal crime of terrorism (as defined in Title 18, United States Code, Section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property; (iii) derived from, involved in, or used or intended to be used to commit any Federal crime of terrorism (as defined in Title 18, United States Code, Section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property; or (iv) of any individual, entity, or organization engaged in planning or perpetrating any act of international terrorism (as defined in Title 18, United States Code, Section 2331) against any international organization (as defined in Title 22, United States Code, Section 4309(b)) or against any foreign Government.

35. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 981(a)(1)(C) and 981(a)(1)(G); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT FOUR

36. The United States hereby gives notice to the defendants charged in Count Four that, upon their conviction of the offense charged in Count Four, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

37. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

*By David Pitluck, Assistant U.S. Attorney*
JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

*By Amy L. DeLine, Acting Director*
LISA K. HSIAO
ACTING DIRECTOR
U.S. DEPARTMENT OF JUSTICE
ENFORCEMENT & AFFIRMATIVE LITIGATION BRANCH